1  Jason Leviton (*pro hac vice* to be filed)
2  Joel Fleming (CA Bar No. 281264)
   Jacob Walker (CA Bar No. 271217)
3  **BLOCK & LEVITON LLP**
   155 Federal Street, Suite 400
4  Boston, MA 02110
5  617.398.5600
   jason@blockesq.com
6  joel@blockesq.com
   jake@blockesq.com
7
8  *Attorneys for Plaintiffs*

9              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
10

11  JANE DOE, MARY MOE, and JOHN DOE,
    individually and on behalf of all others
12  similarly situated,
13
           Plaintiffs,
14
15  v.                                    Civil Action No. 3:18-cv-2125

16  WALMART INC., DARRELL HUNTSMAN,       **JURY DEMAND**
    GLENN BINGHAM, BRIAN ASHTON,
17  JEFFREY S. MITCHELL, RICHARD
    HADDRILL, CHRIS COTTRELL, JEFF
18  POWERS, TIM HICKEY, JEFF
19  STRINGER, DSW, INC., BURLINGTON
    COAT FACTORY WAREHOUSE
20  CORPORATION, BLOOMINGDALES,
    INC., ABERCROMBIE & FITCH
21  MANAGEMENT CO., THE KROGER CO.,
22  SPORTSMAN'S WAREHOUSE, INC., and
    DECATHLON CAPITAL PARTNERS,
23  LLC,
24
           Defendants.
25
26
               **CLASS ACTION COMPLAINT FOR VIOLATION OF**
27         **THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
28

# I. INTRODUCTION

> We don't want one set of rules for people whose collars are blue or whose names end in vowels, and another set for those whose collars are white and have Ivy League diplomas.

> - *G. Robert Blakey, primary drafter of the Racketeer Influenced and Corrupt Organizations Act as Chief Counsel of the Subcommittee on Criminal Laws and Procedures of the United States Senate Committee on the Judiciary*[1]

1. Plaintiffs, on behalf of the Class,[2] bring suit against the Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO").[3] Defendants are not small-time Mafia thugs. They do not break kneecaps; they do not torch storefronts. Many of the nation's leading corporations number are among the Retailer Defendants. The Individual Defendants include graduates of the Harvard Business School, the University of Oxford, and Brigham Young University. But despite their glittering credentials, Defendants are all participants in a long-running, highly profitable extortion scheme that has extracted millions of dollars from thousands of poor, desperate people across the country. And RICO applies, with equal force, to street hoodlums and Harvard MBAs alike.

2. Defendants' scheme is not complicated. Corrective Education Company, LLC ("Corrective Education" or "CEC") is a Utah limited liability company founded by Defendants Huntsman and Bingham and operated by the Individual Defendants. CEC's customers are large

---

[1] Alain Sanders, *Law: Showdown at Gucci*, TIME (Aug. 21, 1989) at 43 (quoting Blakey).

[2] The Class is defined to include all persons who have made payments to CEC through the CEC Program (defined below) in the last four years.

[3] Defendants are: the "Individual Defendants" (Darrell Huntsman, Glenn Bingham, Brian Ashton, Jeffrey S. Mitchell, Richard Haddrill, Chris Cottrell, Jeff Powers, Tim Hickey, and Jeff Stringer), the "Retailer Defendants" (Walmart Inc. ("Walmart"), DSW, Inc. ("DSW"), Burlington Coat Factory Warehouse Corporation ("Burlington Coat Factory"), Bloomingdales, Inc. ("Bloomingdale's"), Abercrombie & Fitch Management Co. ("Abercrombie" or "A&F"), The Kroger Co. ("Kroger"), and Sportsman's Warehouse, Inc. ("Sportsman's Warehouse")), and the "Other Defendant" (Declathon Capital Partners, LLC ("Decathlon")).

retailers (the Retailer Defendants) to whom CEC offers a program that it has branded, with Orwellian relish, as "Restorative Justice" (hereafter, the "CEC Program").

3.     A 2015 article by Slate summarized the CEC Program as follows: "Imagine you're browsing at Bloomingdale's when a security guard taps you on the shoulder and accuses you of shoplifting. He takes you to a private room, sits you down, and runs your name through a database to see if you have any outstanding warrants. Then he tells you that you have two options. The first involves him calling the police, who might arrest you and take you to jail. The second allows you to walk out of the store immediately, no questions asked—right after you sign an admission of guilt and agree to pay … to take an online course designed to make you never want to steal again."[4] In other words, retailers who participate in the CEC program offer suspected shoplifters a choice: (1) face criminal prosecution or (2) take an online class run by CEC. Those who choose the latter option (about 90%) are forced to make a substantial payment to CEC, a portion of which is kicked back to the participating retailer.

4.     In the words of Patrick Harrington, County Prosecutor for Tippecanoe County, Indiana, Corrective Education is "using the power of law enforcement—threats of arrest and [the prosecutor's] office—to compel [accused shoplifters] to take a class for a for-profit program. … That fundamentally is against what American jurisprudence stand[s] for."[5] The Superior Court of California for the County of San Francisco has issued an order enjoining the CEC Program, holding

---

[4] Leon Neyfakh, *Let's Make A Deal: A startup helps stores like Bloomingdale's and Whole Foods give suspected shoplifters a choice: Pay $320, or we'll call the cops*, SLATE (Feb. 26, 2015), available at: http://www.slate.com/articles/news_and_politics/crime/2015/02/shoplifting_at_whole_foods_or_bloomingdale_s_pay_corrective_education_company.html

[5] Ron Wilkins, *At Walmart, $400 and 6 hours will make that shoplifting charge go away*, JOURNAL AND COURIER (July 27, 2017), available at http://www.jconline.com/story/news/local/lafayette/2017/07/27/400-and-six-hours-make-shoplifting-charge-go-away/516599001/

that "[t]he irreducible core of CEC's program is a request by the retailer for the suspect to pay money to CEC in exchange for the retailer's forbearance of notifying the police that the suspect committed a crime. … This is textbook extortion under California law[.]"[6]

5.      Defendants have operated the CEC Program scheme since at least 2012 and have extorted hush money payments from thousands of people. A February 2015 story by Slate stated that 20,000 people had gone through the CEC Program at the time of that article. CEC had $7.6 million in revenue in 2017 alone—nearly all of which is attributable to payments through the CEC Program:



---

[6] *People v. Corrective Education Company, et al.*, No. CGC-15-549094 (Sup. Ct. Cal. Aug. 14, 2017) (the "San Francisco Litigation").

6.     Plaintiffs bring suit under RICO, on behalf of a Class of all persons who have made payments to CEC or purportedly incurred an obligation to pay CEC through the CEC Program in the last four years, and seek treble damages, permanent injunctive relief, attorneys' fees, and any other available remedies pursuant to RICO.

## II.   JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

8.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants Walmart, DSW, Burlington Coat Factory, Bloomingdale's, Abercrombie, Kroger, and Sportsman's Warehouse have agents and transact business in this district, and Defendant Decathlon Capital Partners maintains an office in this district.

## III.   PARTIES

### A.   PLAINTIFFS

9.     Plaintiff Jane Doe is a resident of Loganville, Georgia. In September 2017, Doe used the self-checkout system at a store in Snellville, Georgia operated by Defendant Walmart, Inc. ("Walmart") to purchase food and supplies for a barbeque for her child's birthday party. Doe was the only adult supervising her three children at the time. After checking out with the self-checkout system and paying for a number of items, Doe was detained by loss-prevention personnel of Defendant Walmart who accused her of attempting to shoplift hot dog buns and a case of water (which, according to Defendant Walmart, were not scanned). Walmart's loss-prevention personnel showed Doe a video explaining the CEC Program. In response to Walmart's threat to report Doe to criminal authorities, Doe agreed to participate in the CEC

Program and make payments to CEC. In total, Doe has paid $500 to CEC. After agreeing to participate in the CEC Program, Doe paid for the goods she was accused of attempting to shoplift.

10.     Plaintiff Mary Moe is a resident of Hilliard, Florida. In November 2017, Moe was detained at a Walmart store in Jacksonville, Florida, where she was accused of shoplifting hygiene products and snacks. After being detained by Walmart's loss prevention personnel, Moe was shown a video explaining the CEC Program. In response to Walmart's threat to report Moe to criminal authorities, Moe agreed to participate in the CEC Program and to make payments to CEC. In total, Moe paid $400 to CEC, and completed the CEC Program.

11.     Plaintiff John Roe is a resident of Houston, Texas. In January 2017, Roe was detained at a Walmart store in Alvin, Texas and accused of shoplifting a tri-ball hitch. After being detained by Walmart's loss prevention personnel, Roe was shown a video explaining the CEC Program. In response to Walmart's threat to report Roe to criminal authorities, Roe agreed to participate in the CEC Program and to make payments to CEC. Roe has yet to actually make any payments to CEC but Roe's CEC "account" has recently been sent to collections.

**B.     INDIVIDUAL DEFENDANTS**

12.     Defendant Darrell Huntsman is one of the co-founders of CEC. He is a graduate of Brigham Young University and the Harvard Business School. According to Huntsman's LinkedIn profile, he was the Chief Executive Officer of CEC from January 2011 through August 2015. According to an affidavit filed in the San Francisco Litigation on May 2, 2017 (the "Huntsman Affidavit"), Huntsman stated that he was "currently the President" of CEC. Documents filed with the Utah Division of Corporations and Commercial Code list Huntsman as the Registered

Agent and Manager of CEC. In the Huntsman Affidavit, Huntsman states that he is a "primary founder and officer of CEC," with "first-hand knowledge of the working of CEC's program," based on "personal communication and observations with [CEC's] employees, retailers, local law enforcement, prosecutors, and individuals who have successfully completed the program," as well as "regular and routine review of files generated in the ordinary course of business at CEC." Upon information and belief, Huntsman is a resident of Utah.

13.    Defendant Glenn Bingham is a co-founder of CEC. He is a graduate of Brigham Young University and the Harvard Business School. Bingham's LinkedIn profile lists him as "Founder" of CEC from 2010 to present. Upon information and belief, Bingham is still an investor in and actively involved in the operation of CEC today. Upon information and belief, Bingham is a resident of Utah.

14.    Defendant Brian Ashton is a co-founder of CEC and is the current Chief Executive Officer of CEC. He is a graduate of Brigham Young University and the Harvard Business School. Ashton has been the CEO of CEC since taking over for Huntsman in August 2015. According to a June 2015 profile of Ashton in the LDS Church News, he also served as a manager or director of CEC from 2011 to 2012.[7] Ashton was formerly a consultant at McKinsey & Company. Upon information and belief, Ashton is a resident of Utah.

15.    Defendant Jeffrey S. Mitchell is a member of CEC's board of directors. According to his LinkedIn profile, Mitchell has been a director of CEC from May 2013 to the present and

---

[7] https://www.deseretnews.com/article/865631432/Brian-K-Ashton-New-counselor-in-the-Sunday-School-general-presidency.html

served as its Chief Executive Officer from May 2013 to November 2013. Upon information and belief, Mitchell is a resident of Georgia.

16.     Defendant Richard Haddrill is the Chairman of CEC's board of directors. He is a graduate of the University of Michigan. According to his LinkedIn profile, Haddrill has been CEC's Chairman from October 2011 to the present.   He is the former CEO of Bally Technologies—a slot machine manufacturer.  Upon information and belief, Haddrill is a resident of Nevada.

17.     Defendant Chris Cottrell is CEC's Vice President of Finance and Operations. He holds a bachelor's degree from Brigham Young University and an MBA from Westminster College.  Upon information and belief, Cottrell is a resident of Utah.

    a.  According to his LinkedIn profile, Cottrell was CEC's Corporate Controller from November 2011 to August 2013. His tasks in that position included: "Established business and financial processes for CEC; Oversaw the owner equity fundraising rounds ($3.5M) for operating expenditures;  Guide[d] financial decisions by establishing, monitoring, and enforcing policies and procedures; Established internal monitoring of assets and enforced internal controls; Prepared budgets by collecting, analyzing and consolidating financial data; Provided recommendations and status of the companies [*sic*] financial wellbeing to the CEO and board of directors; Implemented and directed [CEC's] in-house call center."

    b.  From August 2013 to February 2015, Cottrell was CEC's Director of Finance. His tasks in that position included: "Oversaw and led annual budgeting and planning process in conjunction with all corporate auxiliaries; along with monitoring progress and changes while keeping senior leadership abreast of the organizations [*sic*] financial status; Responsible for a variety of areas including human resources, legal and facility management; including relationships with investors and venture capitalists; Managed the organization [*sic*] cash flow and forecasting; Recommended and secured debt financing of $1.25M for operating and capital expenditures; Renegotiated key vendor contracts to bolster Gross Margin by 120% from 2014 to 2015."

    c.  From February 2015 to present, Cottrell has been CEC's Vice President of Finance and Operations. In that role, his tasks included "Assumed responsibility for planning, implementing and managing all finance related activities to support and enhance the organizations [*sic*] goals; … Oversaw all fundraising (debt and equity),

accounting, cash management, budgeting, forecasting, strategic financial planning, cost benefit analysis, audit activities, reporting, facilities and property management, capital projects, and contract analysis and negotiations; Oversaw $5.5M in owner equity financing; Cash infusion through a $1.5M new market tax credit (NMTC); Oversaw and managed the company's $7.6M revenue and $4M budget for 2017; Exceeded EBITDA targets in 2017 by strictly managing COGS and contract negotiation with … vendors and clients; Direct reporting line of 15 people that drive all of CEC's accounts receivables; improved collections rate by 65%; Reported to Board of Directors for financial models, management and controls.

18.     Defendant Jeff Powers has been CEC's Chief Customer Acquisition Officer since November 2014. Powers served as CEC's Senior Vice President of Business Development from June 2013 until November 2014. His LinkedIn profile describes his tasks as Chief Customer Acquisition Officer as "Leading an incredible team of professionals dedicated to promoting Restorative Justice. Building partnerships with corporations, law enforcement agencies and prosecutors. Using mobile and cloud technologies to lead the change in the way petty crimes are handled." Upon information and belief, Powers is a resident of Michigan.

19.     Defendant Tim Hickey was, according to his LinkedIn profile, CEC's Director of National Accounts from August 2013 to February 2015. A November 17, 2014 press release by CEC stated that "Tim Hickey is now the Director of National Accounts. Hickey has over 24 years' experience with retail loss prevention technologies, including video surveillance, EAS, source tagging and RFID solutions. During his distinguished career, Hickey has built strong relationships with many of the country's leading retail loss prevention executives and will continue to do so at CEC." Upon information and belief, Hickey is a resident of Massachusetts.

20.     Defendant Jeff Stringer was, according to his LinkedIn profile, CEC's Executive Director of Business Development from January 2014 to December 2016. A November 17, 2014 press release by CEC stated that "[a]s the new Director of Business Development, Jeff Stringer is

the fourth industry veteran to join CEC and has more than 28 years of technical experience in retail loss prevention and security solutions. He has extensive business development expertise in complex security sales and solution development for retailers. In his new role, he will be responsible for strategic planning to help grow CEC market presence by defining and locating new retailer prospects while coordinating and managing new customer proof-of-concepts pilots and full deployments." Upon information and belief, Stringer is a resident of Texas.

### C.   RETAILER DEFENDANTS

21.     Defendant Walmart Inc. ("Walmart") is a publicly traded Delaware corporation headquartered in Bentonville, Arkansas. It is the largest retail chain in the United States with over 4,000 stores, including stores in all 50 states, Puerto Rico, and the District of Columbia. Walmart operates 320 stores in California, including stores in this District.

22.     Defendant DSW, Inc. ("DSW") is a publicly traded Ohio corporation headquartered in Columbus, Ohio. DSW is a footwear and accessories chain retailer with approximately 500 stores across the United States. DSW operates 49 stores in California including stores in this District.

23.     Defendant Burlington Coat Factory Warehouse Corporation ("Burlington Coat Factory") is a Delaware corporation headquartered in Burlington, New Jersey. It is the wholly owned operating subsidiary of Burlington Stores, Inc., a publicly traded company, incorporated in Delaware and headquartered in Burlington, New Jersey. Burlington Coat Factory is a large chain retailer of coats and outerwear with approximately 600 stores throughout the United States. Burlington Coat Factory operates 66 stores in California, including stores in this District.

24.     Defendant Bloomingdale's, Inc. ("Bloomingdale's") is an Ohio corporation headquartered in New York, New York. It is a wholly owned subsidiary of Macy's, Inc. a Delaware corporation with headquarters in Cincinnati, Ohio and New York, New York. Bloomingdale's is a high-end department store retailer with approximately 55 locations nationwide. Bloomingdale's operates thirteen stores in California, including three stores in this District.

25.     Defendant Abercrombie & Fitch Management Co. ("Abercrombie" or "A&F") is a Delaware corporation with headquarters in New Albany, Ohio. A&F is the wholly owned operating subsidiary of Abercrombie & Fitch Co., a publicly traded company incorporated in Delaware and headquartered in New Albany Ohio. Abercrombie is a retail apparel chain that operates approximately 700 stores nationwide. Abercrombie operates 105 stores in California, including stores in this District.

26.     Defendant The Kroger Co. ("Kroger") is a publicly traded Ohio corporation headquartered in Cincinnati, Ohio. Kroger is a large national chain of supermarkets and convenience stores with locations throughout the United States. Kroger currently operates approximately 2,800 supermarkets and almost 800 convenience stores throughout the country, including multiple stores operating in this District under the "QuikStop" and "FoodsCo" brands.

27.     Defendant Sportsman's Warehouse, Inc. ("Sportsman's Warehouse") is a Utah corporation headquartered in Midvale, Utah. Sportsman's Warehouse is the wholly owned operating subsidiary of Sportsman's Warehouse Holdings, Inc., a publicly traded Delaware corporation headquartered in Midvale, Utah. Sportsman's Warehouse is a retail sporting goods chain with 75 stores in 20 states throughout the Western U.S. and Alaska, including eleven stores in California, including stores in this District.

**D.   OTHER DEFENDANT**

28.     Defendant Decathlon Capital Partners ("Decathlon") is a Delaware limited liability company headquartered in Park City, Utah and Palo Alto, California. Decathlon is an investment firm that focuses on growth-oriented small businesses with annual revenues between $3 million and $75 million.

**IV.   SUBSTANTIVE ALLEGATIONS**

**A.   THE CEC PROGRAM**

29. The CEC Program has operated in substantially similar form since CEC was founded in 2010.

30. The CEC Program works as follows:

    a.  A retailer's security personnel detain a purported suspected shoplifter (the "Extortion Target");

    b.  The retailer conducts a background check against databases, including a database maintained by Corrective Education, to review the Extortion Target's criminal record;

    c.  If the retailer decides to process the Extortion Target through the CEC Program, its security personnel read the following statement to the Extortion Target:

> "Our establishment is offering you an alternative option to traditional shoplifting consequences. You have the option to watch a video that will explain this alternative option in more detail. If you view the video, please pay close attention as it is entirely your decision to determine which option is best for you, and I cannot advise you."

    d.  The Extortion Target then views a video created by Corrective Education and is presented with the alternative to "traditional shoplifting consequences": enrolling in an "educational course" provided by CEC.

The script that CEC used from April 8, 2013 to, at least, July 14, 2016[8] reads as follows:

> Notice: you are watching this video because you have been detained by this company for a serious crime with very serious criminal consequences. This establishment is giving you the chance to avoid these serious criminal charges. This video is not intended as legal advice, but it will outline an option provided by this establishment. This establishment does not profit from your choice, so whether you take that option is entirely your choice.
>
> OK, slow down. You need to know what's happening here. Right now, the agents who have detained you are preparing a case against you. They are gathering the evidence and making a record of this crime.
>
> You need to know, the legal consequences of theft are serious, long lasting, and can include any or all of the following: police involvement, jail time, an expensive trial, high fines, and even a permanent criminal record. In addition, there are civil demands, or consequences for theft, which allows the establishment to recover the cost of stolen property, the time and resources lost, as well as attorney fees and court costs, adding up to hundreds of dollars.
>
> But I want to tell you that we're giving you a choice, what we call, the resolution option. This option avoids the criminal and civil consequences and enrolls you in a life skills program. If you choose the resolution option, you won't have to wait for the police, you won't have to go to jail, and you won't have a criminal record of this incident. The criminal process is expensive, with lawyers, court fees, and even fines which can range up to $1,000. With the resolution option, you avoid court costs, and won't be charged with fines. The resolution option is not free, but it will likely cost you less than the criminal process, and Corrective Education Company can create a payment plan to suit your unique circumstances. People are often afraid of jail time or fines, but I want to warn you, having a criminal record can do more damage than paying hefty fines or even spending time in jail. Criminal record has long lasting effects. It can [a]ffect credit, ability to get a car, or rent, or even buy a place to live. A criminal

---

[8] As set forth below, CEC claims to have used an updated script in California after July 14, 2016. It is unclear whether the script was also updated in other states.

1

2

3

4

record can make it hard to get a job. And it can even affect current employment once it becomes part of the public record. However, this establishment wants to give you a chance, a chance to learn, so that this incident won't negatively affect you for the rest of your life.

5

6

7

8

9

Let me tell you more about the resolution option. It's a voluntary program that you can complete on the [I]nternet, or with a workbook that you can complete at your own pace in the privacy of your own home. This program demonstrates the consequences of crime on your life and others, but it also teaches you valuable life changing skills, skills to help you get a job, excel in the work place, and live the life you want.

10

11

12

As soon as you enroll in this program, you'll be released, and you won't have criminal charges pressed against you. And, you will avoid the costs of civil demands. The civil demands are what the law allows a business to recover for the expenses caused by your actions.

13

14

15

To enroll, you will need to do two things. First, you will need to sign an admission of guilt. This admission will not be used if you complete the program. Remember, if you complete the program, no criminal charges will be filed.

16

17

18

19

20

Second, the agents are going to give you information with a phone number for CEC coach. Call this coach in the next 48 hours. This is the most important step you will take. Your CEC coach is on your side and will walk you through everything you need to do to complete the resolution option. Your CEC coach will also set up a payment plan suited for you and your needs and abilities.

21

22

23

24

25

Once again, when you complete the resolution program, no charges will be filed, you will not have to go to jail, and you won't have to pay any criminal fines. Most importantly, you will not have a criminal record and you will avoid the cost of civil demands. However, if you fail to comply with the requirements of this program, if you don't complete it, your case will be submitted to the police and they may issue a warrant for your arrest. This will happen only if don't complete the program.

26

27

28

I need to warn you of one more thing. If you're detained at another establishment, the charges from this case will be forwarded to prosecution. Also, if you commit a new offense at this

establishment within 12 months, this case will be reopened and
you may charged with this offense and the new offense, where the
judges may impose more serious penalties for multiple offenses,
jail time will be longer, fines will be higher, and punishment will
be more severe. If you understand anything from this video, it
should be this. This crime is serious. But this establishment is
giving you a choice to avoid criminal charges and to learn from
your experiences rather than suffer the consequences.

So if you choose to take the resolution option, tell the officer now.
The choice is yours.

An updated script that CEC has used since July 15, 2016 in California (it is unclear
whether the updated script is also used in other states) reads as follows:

You are watching this message because you have been detained
by this company for a crime with potential criminal
consequences. This establishment is giving you the chance
to avoid these criminal charges.

This video is not intended as legal advice, but it will outline an
option provided by this establishment.

This establishment receives no compensation for your choice. It
is entirely your decision if you choose to take this course.

You have been detained for shoplifting. Because this is your first
offense, this retailer would like to offer you a voluntary option as
an alternative to resolve this situation. This retailer wants you to
move beyond this incident and become a productive citizen and a
loyal customer.

We call this the Restorative Justice Option. If you choose the
Restorative Justice Option, there are three items that need to be
completed:

Number 1: Not repeat this offense. This option is only provided
to first time offenders.

Number 2: Take a six to eight hour education course offered by
Corrective Education Company or CEC. This education course
is designed to help you learn why you make decisions that are
harmful or illegal and then how. to make positive behavior
changes. Then you will gain life skills that will help you to lead a
more constructive life.

Number 3: Pay for the education program. If you cannot afford this program, there are payment plans and financial assistance to help you. Your financial situation should not play a factor in whether to enroll in this program. You can contact CEC for this assistance.

Upon enrolling, you will need to contact CEC within 72 hours. During this 72-hour period, you are free to consult with an attorney. If you wish to consult with an attorney but you cannot afford one, you may call CEC and they will assist you to find legal aid services in your area.

If you choose to enroll and you successfully comply with the terms of the Restorative Justice Option, the retailer will not pursue this matter with law enforcement. Also, the retailer will not seek to have you pay the civil demand claims, which they are entitled to under the laws of this state. Finally, no criminal or arrest record related to this incident will be associated with you. If you accept the Restorative Justice Option but do not comply with the terms set forth here, CEC will refer this matter back to the retailer.

This retailer may pursue other legal rights to seek restitution and resolve this crime at their discretion.

To review, if you select the 'Restorative Justice Option, you must: 1) not recommit this crime; 2) complete CEC's online education course, and 3) contact CEC within 72 hours and to enroll in the course and arrange for payment for the education course.

If you would like to select the Restorative Justice Option, please let the store associate know. The store associate will provide you with instructions and the Restorative Justice Agreement.
Please read the agreement carefully as it contains all the terms of the Restorative Justice Option and the pricing for the educational course.

e. Extortion Targets have 72 hours to decide whether to enroll. Those who succumb to CEC's threats—more than 90% of Extortion Targets—are given two payment options:

    i. a one-time payment of $400; or

1

2

      ii.  a deferred payment plan which requires a $50 up-front payment and a total payment, over time, of $500.[9]

3

4

5

    f.  When the CEC Program began, CEC would pay a portion of the money collected from each Extortion Target to the referring retailer. In the Huntsman Affidavit, Huntsman claims that "CEC no longer offers reimbursements, or payments of any kind to retailers who offer its program."[10]

6

7

8

    31.    In 2014, Defendant Huntsman filed a patent application (the "Patent Application")[11] for a "system and method for preventing retail loss," which included the following flow chart depicting the CEC Program:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

[9] CEC claims to offer a "tuition assistance" program for Extortion Targets who cannot afford a $400 or $500 payment. But according to the Huntsman Affidavit, only 3%-4% of "course takers" receive a discount and the average financial assistance discount is only $250.

25

The Huntsman Affidavit is attached as Exhibit A. Plaintiff does not allege (and, indeed, expressly denies) that all of the self-serving statements in the Huntsman Affidavit are true.

26

[10] Plaintiff lacks sufficient information to determine the truth of this self-serving statement or to determine when, if ever, CEC stopped making these kickback payments.

27

[11] US 2014/0279579 A1. Attached hereto as Exhibit B.

28



32.     The Patent Application provided the following description of the CEC Program, which repeatedly makes clear that a failure to pay will result in CEC or the retailer reporting the Extortion Target to the criminal authorities:

> [W]hen a store owner or management team first apprehends a shoplifting suspect, the suspect is given an initial interview (S1) where **the suspect is given the choice of cooperating in a civil remedy, which may include an educational course in behavior modification, or, alternatively, being criminally prosecuted for the theft.** If the suspect agrees to the civil remedy, the owner proceeds to provide an overview (S2) to the suspect about the alternative civil process instead of the traditional method of initiating a criminal arrest. This overview is preferably presented to the suspect in the form of a short video presentation, which can be displayed on a laptop computer, tablet computer, hand-held computer, or hand-held communication device such as a smart phone or tablet device.
>
> …

After obtaining the suspect's information and agreement to proceed with the methods of civil remedy disclosed in the present invention, the owner or merchant then obtains the suspect's voluntary, written admission of guilt (S5) and the suspect's agreement to participate in and to complete corrective education coursework within a specified timeframe (S6). The coursework is the[n] provided to the suspect (S7). Under one embodiment, the timeframe for allowing the suspect to complete the coursework is determined by local standards of the applicable statue [*sic*] of limitations associated with the offense as well as considerations related to the length of the course and the perceived ability of the individual to comprehend and complete the work. It is preferred that the timeframe be at least fifteen days after the incident, preferably thirty days after the incident, and in no event longer than the applicable statue [*sic*] of limitations associated with the offense.

…

**If the suspect is in default on the coursework, through either failing to complete the course or failing to pay for the course within the noted timeframe, the records of the incident are forwarded to law enforcement or local prosecutors with the suspect's written admission of guilt and a criminal complaint is filed on behalf of the retailer.** In another embodiment of the preset invention, a third-party administrator monitors the suspect's progress in and payment for the corrective education coursework. The third-party administrator, or corrective education administrator (CEA), has access to database (140) and a copy of the suspect's written admission of guilt and his agreement to complete the coursework. **The CEA, on behalf of the owner, will proceed to forward this information to law enforcement officials or to local prosecutors in the event of default by the suspect.**

…

33.     In the course of litigation with the San Francisco City Attorney's Office (the "San Francisco Litigation"), CEC produced recordings of conversations between "coaches" employed by CEC and Extortion Targets who had agreed to participate in the CEC Program. Excerpts of transcripts of those conversations filed in the San Francisco Litigation show CEC employees extorting money from desperate people unable to afford even a $50 payment through threats of criminal prosecution. For example:

a.  Example One

CEC: So this course is just given as an option. So if you're unable to make the payments until January, the information will just get sent back to the store.

Caller: And then what they do; what do they do?

CEC: So they would handle it as if our course was never an option. So most likely that would mean sending it on to the law enforcement and filing criminal charges.

…

Caller: Um. There's no way I'm gonna be able to make that payment by tomorrow.

CEC: Okay. Um, do you think you'd be able to make it some time this week? Or is it you wouldn't be able to make that payment until January?

Caller: I have – not until January.

CEC: Okay. So we'll just have to send the information back then. So what would happen is most likely you'll receive some type of attention to appear in Court.

b.  Example Two

Caller: I don't pay rent, I'm homeless.

…

CEC: What's really going to keep your information here is that payment of [$]50, so if anything comes up, if anyone can help you out, something comes up where you can process [$]50, give us a call right back.

Caller: So what if I can't get any help? I know I'm not going to be able to get anybody. And I don't know [how] I'm going to be able to get the money. And I don't want to go to jail, or get this to show up on my arrest.

CEC: Then you need to at least get ahold of some documentation showing you don't have any income, and then call back. … We can see if we can do something with that but we can't really guarantee that we'll still allow you to enroll in the program.

c.  Example Three

Caller: What would happen if I can't make the $50 payment? Then how does that go?

1         CEC: Then what would happen is that your information would end up being sent
2         back to Walmart, who would then file charges for the incident.

3     d.  Example Four

4         CEC: If you still can't make any sort of payment on the due date, it is a $5 late fee
for every day it's late up until 5 days. At 5 days it maxes out at $25. But after that if
5         you can't make a payment after 6 days, there is a chance that your information could
6         be sent back to the retailer where they can then file charges.

7     e.  Example Five

8         CEC: Just make sure you get that payment in on the fifth because I'm going to
9         explain the risks of if you don't. If you don't get that payment in by the due date,
Walmart has the ability to look back and see that the payment isn't made and they
10        can take his information back and send it off. So just make sure you get that payment
11        made by that due date so he isn't at risk of getting his information sent off to law
enforcement.

12     f.  Example Six

13         Caller: Why did they charge me $400 though?
14

15         CEC: That covers the cost of the course and we can guarantee that resolving the
incident through the course, that Walmart will not file civil or criminal charges…
16        so [there will] be nothing on your record.

17    34. In the course of the San Francisco Litigation, CEC also produced copies of letters sent to

18 Extortion Targets who failed to make payments to CEC. These letters included direct threats that

19 Extortion Targets would be reported to criminal authorities unless they paid up. For example:

20

21     a.  "Failure to complete this program will be reported as 'FAILED' and charges will
be filed in court."

22     b.  "Failure to complete this program will be reported as 'FAILED' and your records
23        will be turned over to local law enforcement."

24     c.  "If you do not complete this course immediately, we will have no option but to
report your case as 'FAILED' and refer this incident to local law enforcement."
25        (emphasis original)

26     d.  "The pending charges against you will be dropped in exchange for the successful
27        completion of CEC's court alternative, educational program. … This program is

28

voluntary and its completion is **MANDATORY** in order for you to stay out of court and keep these charges off of your criminal record." (emphasis original).

## B.    CEC's Co-Conspirators

35.    A number of prominent American retail brands have participated in this sordid extortion scheme.

36.    **Walmart.** In April 2014, Walmart and CEC executed a Master Services Agreement for the implementation of the CEC Program at Walmart stores. A copy of that agreement is attached hereto as Exhibit C. A November 1, 2016 story in Security magazine quoted Walmart's Vice President of Asset Protection, Mike Lamb, as saying that Walmart was implementing the CEC Program at one-third of its stores nationwide:

> Walmart is currently piloting the solution in about a third of its stores, with plans to expand it, says Mike Lamb, Vice President of Asset Protection for Walmart.
>
> Walmart has typically relied on local law enforcement to deal with crime on company property, but its partnership with CEC is helping to reduce the burden of shoplifting on the criminal justice system and on its loss prevention teams. Walmart executives are hoping the collaboration can help the store earn back some of the $3 billion it loses each year to shoplifting.
>
> 'We've had the program in pilot at a handful of stores since 2014 so we could evaluate results and effectiveness,' Lamb explains. 'We have recently expanded the number of participating stores after the initial pilot was shown to be successful in reducing calls to law enforcement while providing first-time offenders a second chance to make better choices for themselves in the future.'
>
> Lamb adds that Walmart's Asset Protection Field Teams go through training sessions with the CEC Restorative Justice Providers. 'Our providers utilize mobile technology and communicate to the participants on how the program works through pre-recorded videos so that the communication to each participant is both fair and consistent. We also strive to work closely with local law enforcement because we know their collaboration and support is very important to overall success,' he says.
>
> A main goal of the program at Walmart, Lamb says, is to decrease store calls to law enforcement. 'The reduction of calls to law enforcement also benefits our

associates because they spend less time processing an offender or in court and instead can focus time and efforts on the sales floor.'

37.    **DSW.** On December 3, 2014, CEC and DSW issued a press release announcing that DSW would be implementing the CEC program in its stores. In relevant part, the release stated:

> Corrective Education Company (CEC), a leading provider of Restorative Justice Education Programs, today announced that DSW, Inc. has made the decision to incorporate the CEC Restorative Justice Education solution into its Loss Prevention program.
>
> …
>
> 'DSW was looking for an alternate method of dealing with shoplifters in our stores, one that aligns with our core values,' said Jordan Rivchun, Senior Manager of Investigations for DSW. 'While every retailers' objective is to reduce losses and stem shoplifting in their locations, we were looking for solution that could not only deliver on that objective, but one that offered a compassionate approach for those individuals who may have simply made a bad choice.'
>
> …
>
> 'DSW now joins the list of prestigious retailers that are looking to change the way petty crimes are handled through the deployment of our Restorative Justice Education Program,' stated Darrell Huntsman, Founder and CEO of CEC. 'Our approach to petty theft has proven to be effective in helping individuals get the support they need though education that helps them put their lives back on track, which ultimately has a positive impact on their communities.'
>
> …
>
> 'At DSW, we have a team of loss prevention professionals who are responsible for a large number of locations. Anytime we can deploy technology that helps us streamline our processes, save time and energy, and be a better partner to both law enforcement and the communities we operate in, we consider that to be a force multiplier. CEC delivers on all points,' concluded Rivchun.

38.    **Burlington Coat Factory**. On June 4, 2014, CEC issued a press release stating "BURLINGTON COAT FACTORY EXPANDS DEPLOYMENT OF CORRECTIVE

EDUCATION COMPANY'S RESTORATIVE JUSTICE EDUCATION PROGRAM." In relevant part, the release stated:

> Corrective Education Company (CEC), a leading provider of Restorative Justice Education Programs, today announced that Burlington Coat Factory will be expanding the deployment of its restorative justice education program to more of its locations. Burlington Coat Factory, a national off-price apparel, home and baby products retailer, operating more than 500 stores in the United States and Puerto Rico, initially launched the program in four of its high risk locations in January of 2014. Intent on monitoring the progress of the program for 90 days, clear and measureable results lead to the decision to expand the solution after 45 days of deployment.
>
> 'This is a program that is a win-win for everybody. The Retailer, Law Enforcement and the Offender,' stated James Connelly, Senior Vice President of Asset Protection for Burlington Stores. 'I see no reason not to utilize CEC as part of any retailer's Loss Prevention program.'
>
> …
>
> 'Our mission at CEC is to create and deploy alternative ways to deal with offenders that is not only fair to all parties involved, but also protects the rights of the retailers and offenders,' stated Darrell Huntsman, Founder and CEO of CEC. 'We are pleased that Burlington Coat Factory has implemented our solution. Our education programs and proprietary intake and management system ensure that retailers receive the justice they deserve while helping their communities by reducing the burden on the criminal justice system and offering offenders the support and tools they need to help change the course of their lives.'

39.    In August 2014, Burlington Coat Factory and CEC executed a Retail Diversion Program Agreement for the implementation of the CEC Program in Burlington Coat Factory stores. A copy of that agreement is attached hereto as Exhibit D. Section 5 of the agreement, titled "PAYMENT TO RETAILER" provides, in relevant part, that "CEC shall pay Retailer $40.00 (the 'Retailer Fee') per Detainee validly qualified by the Retailer…"

40.    **Bloomingdale's.** On September 3, 2013, Bloomingdale's and CEC executed a Pilot Agreement for the implementation of the CEC Program in Bloomingdale's stores. A copy of that agreement is attached hereto as Exhibit E. The agreement provides, in relevant part, that

"Bloomingdales [*sic*] will be compensated by CEC in the amount of $40 for processing each 'qualified individual' entered into the CEC program…" CEC's website currently boasts the following endorsement from Chad McIntosh, Bloomingdale's Vice President of Loss Prevention and Risk Management: "Bloomingdales has seen a significant reduction in the time to process offenders by using the CEC program. Looking at our processing time we have seen a 47% reduction, which allows our detectives to return to the sales floor much quicker. We generally run a 25% recidivism rate. With CEC we have not seen any of the offenders return that have been through the training."

41.     **Abercrombie.** On April 17, 2015, Abercrombie and CEC executed a Pilot Agreement for the implementation of the CEC Program in Abercrombie stores. A copy of that agreement is attached hereto as Exhibit F. The agreement provides in relevant part that "Abercrombie & Fitch will be compensated by CEC in the amount of $40 for processing each 'qualified individual' entered into the CEC system…"

42.     **Kroger.** On July 6, 2015, Kroger and CEC executed a Services Agreement for the implementation of the CEC Program in Kroger stores. A copy of that agreement is attached hereto as Exhibit G. Attachment C to the agreement provides, in relevant part, that "It is anticipated that Kroger will donate the reimbursement of $40 (the 'Overhead Recovery') for processing each Verified Individual."

43.     **Sportsman's Warehouse.** In September 2015, Sportsman's Warehouse and CEC executed a Retail Diversion Program Agreement for the implementation of the CEC Program in Sportsman's Warehouse stores. A copy of that agreement is attached hereto as Exhibit H. Section 5(a) of the agreement, titled "Payment To Retailer" provides, in relevant part, that "CEC shall

reimburse Retailer $40 … per each Verified Individual validly processed by Retailer using the Retailer Program…"

44.     **Decathlon** provided funding for the extortion scheme. On February 23, 2015, CEC and Decathlon issued a press release stating, in relevant part, that CEC had "secure[d] (undisclosed) funding from Decathlon Capital Partners":

> The funding will accelerate international and domestic growth, product development and customer expansion for CEC, a technology company working with retailers to improve loss prevention with their web-based education platform designed around the Restorative Justice practice. … By working with Decathlon's group, CEC will have the 'flexibility and expertise to grow businesses. Working through Decathlon's Palo Alto office provides a network with technology experts in software and data security as well as visibility with retailers and government officials,' reveals Darrell Hunstman, Founder and CEO of CEC.

> According to Decathlon Partners, having worked with hundreds of growth-focused businesses during the last decade, after 'coupl[ing] the fundamentals of CEC's business model and includ[ing] an experienced and outstanding management team,' Decathlon confidently unveils the 'ease [in] decision to work with CEC.' [*sic*]

## V.     CLASS ALLEGATIONS

45.     Plaintiffs bring this action on behalf of themselves and the following Class, pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons who have made payments to CEC or purportedly incurred an obligation to pay CEC through the CEC Program in the last four years.

46.     The Class excludes the officers and directors, and current or former employees, as well as immediate family members thereof, of Defendants and their parents, subsidiaries, and affiliates.

47.     The Class is so numerous that joinder of all members is impracticable.

48.     There are questions of fact or law common to the Class.  These questions include, but are not limited to:

a.   Whether the CEC Program is extortion;

b.   Whether Defendants were or are engaged in a pattern of racketeering activity; and

c.   The extent that Class members have been damaged.

49.     Plaintiffs' claims are typical of the Class and Plaintiffs are not subject to any unique defenses.

50.     Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests do not conflict with the interests of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation of this type.  Plaintiffs' counsel will fairly and adequately protect the interests of the Class.

51.     Certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

52.     Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members.

53.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual lawsuits are economically infeasible and procedurally impracticable.

54.     Plaintiffs know of no difficulty to be encountered in the management of this case that would preclude its maintenance as a class action.

## VI.   CLAIMS ALLEGED AND RELIEF SOUGHT

### COUNT I
### Violation of 18 U.S.C. § 1962, *et seq.*

55.     The foregoing allegations are incorporated herein by reference.

56.     This Count is against all Defendants.

57.     CEC is an enterprise engaged in and whose activities affect interstate commerce. The "CEC Program Enterprise," consisting of CEC, the Individual Defendants, the Retail Defendants, and the Other Defendant with whom they implement the CEC Program is an associated-in-fact enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with CEC and the CEC Program Enterprise (collectively, the "Enterprises").

58.     Defendants agreed to and did conduct and participate in the conduct of the Enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of extorting unlawful payments from Plaintiffs and other Class members, directly and indirectly acquired and maintained interests in and control of the Enterprises, and conspired with each other to do so.

59.     Pursuant to and in furtherance of their extortionate scheme, Defendants committed multiple related acts of extortion in violation of 18 U.S.C. § 1951 and state extortion laws by coercing Plaintiffs and other Class members into making payments to CEC by threatening to report Plaintiffs and other Class members to criminal authorities for alleged shoplifting.

60.     Those acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

61.     Defendants have directly and indirectly conducted and participated in the conduct of the Enterprises' affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962.

62.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962, Plaintiffs and other Class members have been injured in their business and property in that they have paid money to CEC as a result of extortion.

**Prayer for Relief**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor as follows:

A.  Certify this matter as a class action, appoint Plaintiffs' attorneys as class counsel, and issue notice to the Class;

B.  Enter judgment in favor of Plaintiffs and the Class against Defendants;

C.  Award to Plaintiffs and Class members actual, statutory, treble, and punitive damages;

D.  Award appropriate pre- and post-judgment interest;

E.  Grant an award of reasonable attorneys' fees and other litigation costs reasonably incurred, including expert witness fees;

F.  Grant a trial by jury on all issues so triable; and

G.  Award any and all other relief to which Plaintiffs and the Class may be entitled.

1

Dated: April 9, 2018

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ Joel Fleming
Jason Leviton (*pro hac vice* to be filed)
Joel Fleming (CA Bar No. 281264)
Jacob Walker (CA Bar No. 271217)
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 400
Boston, MA 02110
617.398.5600
jason@blockesq.com
joel@blockesq.com
jake@blockesq.com

*Attorneys for Plaintiffs*